# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COOKEVILLE DIVISION

NORMA JEAN SIDWELL,      )
     Plaintiff,           )
                         )     Civil Action No. 2:12-0005
v.                        )     Judge Nixon/Brown
                         )
MICHAEL ASTRUE,         )
Commissioner of Social Security,  )
     Defendant.        )

To:    The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act (the "Act"), as amended. Currently pending before the Magistrate Judge are Plaintiff's Motion for Judgment on the Record and Defendant's Response. (Docket Entries 6, 7, 10). The Magistrate Judge has also reviewed the administrative record ("Tr."). (Docket Entry 4). For the reasons set forth below, the Magistrate Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**.

## I. INTRODUCTION

Plaintiff filed her application for SSI and DIB on December 16, 2008, with an alleged onset date of July 15, 2008 due to arthritis, back and shoulder problems, lupus, asthma, stomach problems, high blood pressure, and depression. (Tr. 115-27). She was insured through December 31, 2008. (Tr. 43). Her claim was denied initially and on reconsideration. (Tr. 58-69, 76-79).

At Plaintiff's request, a hearing was held before ALJ Frank Letchworth on June 18, 2010. (Tr. 9-35). The ALJ issued his partially favorable decision on August 11, 2010. (Tr. 40-57).

1

In his decision partially denying Plaintiff's claims, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Administration through December 31, 2008.
2. The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. Since the alleged onset date of disability, July 15, 2008, the claimant has had the following severe impairments: degenerative disc disease, residuals from right shoulder injury and surgery, systemic lupus erythematosus, GERD, chronic obstructive pulmonary disease and obesity. Beginning on the established onset date of disability, June 4, 2009, the claimant has had the following severe impairments: degenerative disc disease, residuals from right shoulder injury and surgery, systemic lupus erythematosus, GERD, chronic obstructive pulmonary disease, obesity and diabetes mellitus. (20 CFR 404.1520(c) and 416.920(c)).
4. Prior to June 4, 2009, the date the claimant became disabled, the claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5. After careful consideration of the entire record, the undersigned finds that prior to June 4, 2009, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she required the option to alternate between sitting and standing at thirty minute intervals, she could perform no more than occasional pushing, pulling or reaching overhead with her right upper extremity, no more than occasional climbing of ladders, ropes or scaffolds, no more than frequent operation of foot controls, climbing of stairs, balancing, stooping, kneeling, crouching or crawling and she could have no concentrated exposure to pulmonary irritants.
6. Since July 15, 2008, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).
7. Prior to the established disability onset date, the claimant was a younger individual age 18-49 (20 CFR 404.1563 and 416.963).
8. The claimant has a marginal education and is able to communicate in English (20 CFR 404.1564 and 416.964).
9. Prior to June 4, 2009, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10. Prior to June 4, 2009, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR

2

404.1569, 404.1569a, 416.969, and 416.969a).

11. Beginning on June 4, 2009, the severity of the claimant's impairments has met the criteria of section 1.04A of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d) and 416.925).

12. The claimant was not disabled prior to June 4, 2009, (20 CFR 404.1520(g) and 416.920(g)) but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(d) and 416.920(d)).

13. The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2008, the date last insured (20 CFR 404.315(a) and 404.320(b)).

(Tr. 41-53).

The Appeals Council denied Plaintiff's request for review on November 16, 2011. (Tr. 5-7). This action was timely filed on January 20, 2012. (Docket Entry 1).

## II. REVIEW OF THE RECORD

Plaintiff began seeing Dr. Pushpendra Jain on June 7, 2006. (Tr. 332-77). She complained of shoulder pain, abdominal pain, and hypertension. (Tr. 374-77). Plaintiff had an MRI of the right shoulder on June 20, 2006. (Tr. 328). The MRI showed acromioclavicular joint arthropathy with hypertrophy producing moderate impingement of the supraspinatus muscle and tendon. *Id.*

Plaintiff saw Dr. Donald Arms at McMinnville Orthopedic Clinic beginning on July 10, 2006. (Tr. 220-26). She complained of right shoulder pain of a moderate discomfort that interfered with activities of daily living and sleep. She had tried an injection and pain medications. Dr. Arms recommended a distal clavicle excision, arthroscopic decompression. Plaintiff saw Dr. Arms for a post-surgery follow-up on July 18, 2006. There was no evidence of complications, and physical therapy was recommended. On September 20, 2006, Dr. Arms noted she was improving but slowly, and essentially all motion had been regained except for some tightness in internal rotation. He recommended continued rehabilitation.

On September 26, 2006, Dr. Jain diagnosed Plaintiff with lupus and reflux. (Tr. 360-61).

3

On November 4, 2008, Dr. Jain noted Plaintiff has COPD and back pain of one month's duration. (Tr. 343-44). On January 6, 2009, Dr. Jain noted Plaintiff had persistent back pain for one month, with sharp pain in the shoulder blades and upper and lower back. There was no radiation, and the pain was precipitated by exertion. Plaintiff also had flank pain and leg weakness. Her pain was a 6 on a 10-point scale. (Tr. 334-35). Dr. Jain ordered a lumbar CT on the same date, which showed spinal stenosis T12-L1 and osteoarthritis and facet hypertrophy at the multiple levels. (Tr. 346).

Plaintiff saw Dr. Samantha McLerran on February 5, 2009. (Tr. 286-95). She noted Plaintiff was followed for COPD, GERD, hypertension, and SLE. Pains were shooting into the tops of both Plaintiff's feet from midcalf down. Dr. McLerran described Plaintiff as having a "great deal of problems with her back." *Id.*

Plaintiff completed a pain questionnaire and function report dated February 9, 2009. (Tr. 151-63). Her pain began in early 2008, beginning in her upper and lower back. She cannot bend over, reach out, or squat down, and she cannot sit or stand for long periods of time without being in pain. The pain radiates down her legs and arms. Pain is brought on by walking, sitting, sweeping the floor, lying down, washing dishes, and driving. Medications relieve pain somewhat for an hour or so, and side effects include sleepiness and dizziness. She rests lying down to relieve pain. The pain began to affect her activities in July 2008 and limits all activities.

On a typical day, Plaintiff wakes around 6, gets her son up for school, cleans house for about an hour off and on, prepares breakfast, washes dishes, naps, reads and watches television, prepares supper, washes dishes, and goes to bed. (Tr. 156-63). She also does laundry. She sits on a stool to bathe and has difficulty bending over to put on shoes and tie them. She shops for groceries twice per month. She cannot lift anything heavy, cannot squat, cannot kneel, and cannot sit or

stand for long periods. Bending or reaching causes pain.

On April 5, 2009, Dr. Jerry Lee Surber performed a consultative exam on Plaintiff. (Tr. 311-15). He noted Plaintiff had palpable tenderness in the right greater than the left neck at C5 through C7 paravertebral musculature, with no muscle spasm present and voluntary flexion at 50 degrees, extension at 60 degrees, right and left lateral flexions at 45 degrees, and right and left rotations at 80 degrees. Plaintiff had shortness of breath due to COPD. She also had narcotic dependency. Her complaints of pain resulted in decreased voluntary mobility in the right shoulders, and she was shaky when standing on the right or left leg and had a waddling side-to-side type gait. An MRI showed her rotator cuff was intact with impingement of her supraspinatus muscle and tendon. A CT scan showed T12-L1 spinal stenosis.[1] Dr. Surber believed she could lift and/or carry 10 to 25 pounds occasionally, stand or walk up to two to four hours in an eight-hour workday, and sit up to six to eight hours in an eight-hour workday.

Dr. Joe Allison, a non-examining consultant, reviewed Plaintiff's records in a report dated May 15, 2009. (Tr. 317-25). He concluded she could frequently lift up to 10 pounds and occasionally lift 20 pounds and could stand for six hours and sit for six hours in an eight-hour workday. She was limited in pushing and pulling in the right arm. She could occasionally balance and had limited reaching in all directions. She should avoid concentrated exposure to fumes, gases, dusts, odors, and poor ventilation.

Plaintiff visited Dr. McLerran on June 1, 2009, complaining of a lumbar region pain flare up. (Tr. 387-90). While working at a factory, she bent over to pick up an item and experienced

---

[1] Dr. Surber referred to the CT scan as showing C12-L1 spinal stenosis, which appears to be a typographical error. He refers to the January 6, 2009 CT scan, which showed spinal stenosis at T12-L1. (Tr. 314, 346).

5

Case 2:12-cv-00005   Document 11   Filed 11/15/12   Page 5 of 12 PageID #: 498

severe pain. The pain radiated into her left leg and was alleviated by pain medication.

On June 4, 2009, Plaintiff had an MRI of the lumbar spine. (Tr. 329-30). The MRI showed multilevel degenerative disc disease extending from T12 through S1.

Plaintiff's pain questionnaire and function report from June 16, 2009 were similar to her February 9, 2009 reports. (Tr. 189-201). She reported more intense and more frequent pain. On June 1, 2009, she could barely get out of bed due to pain and was sent for an MRI. She could barely lift a gallon of milk with her right arm. Concentration was difficult due to fatigue.

Dr. Jain provided a sworn statement dated May 24, 2010. (Tr. 437-47). He noted Plaintiff had back surgery in 2009 involving C4, C5, and C6 with screws and one grafting and fusion at C4, C5, and C6, which was performed by Dr. Schlosser. She still has pain and discomfort, as well as numbing of the thumb and first finger, leading to an inability to perform fine and gross movements. Her lumbar spinal stenosis was diagnosed by MRI in June 2009. He noted that the MRI without contrast might not show compromise of the nerve roots. He believed she could lift up to 10 pounds frequently, could sit for 30 minutes without moving or standing, and could walk 20 to 30 minutes without a break. She was limited to minimal crouching and no stooping. She might need a cane to ambulate occasionally.

At the hearing, Plaintiff testified that she last worked in 2005 for one night. (Tr. 14). She dropped out of school in seventh grade to help her mother care for Plaintiff's disabled siblings. (Tr. 16-17).

Plaintiff described her worst medical problems as her back and neck. (Tr. 20). She had surgery on her shoulder in the 1990s and back surgery recently. (Tr. 20). Her arm worsened sometime in 2009, and she cannot lift a half gallon of milk with her right arm. (Tr. 22-23). She has

pain and tingling from the waist down, worse on the right side. (Tr. 24). She cannot bend over. (Tr. 30). On the day of her hearing, she was having a bad pain day and had been up all night. (Tr. 30).

Plaintiff drives occasionally, as much as 13 miles. (Tr. 16). She sweeps, mops, and washes dishes, with breaks. (Tr. 25). She is able to cook simple meals and buy groceries with her teenaged son's help. (Tr. 26). She spends most of her day on the couch. (Tr. 27).

Vocational Expert ("VE") Anne Thomas testified regarding potential jobs a hypothetical individual could perform given a specific residual functional capacity ("RFC"). The ALJ first presented a hypothetical individual with Plaintiff's education and work experience who could perform at the light exertional level with a sit/stand option; 30 minute intervals of sitting and standing; frequent pushing or pulling in the dominant right extremity; occasional climbing of ladders, ropes or scaffolds; frequent postural activities; frequent reaching overhead with the dominant right upper extremity; and who must avoid concentrated exposure to pulmonary irritants. The VE believed that hypothetical individual could not perform Plaintiff's past relevant work but could perform the jobs of hand packer (2,700 in Tennessee/100,000 nationwide), production laborer (6,000 in Tennessee/180,000 nationwide), and production machine operator (3,000 in Tennessee/120,000 nationwide).

The ALJ then asked the VE if the additional limitations of occasional pushing and pulling with the dominant right upper extremity, occasional reaching overhead with the dominant right upper extremity, and frequent operation of foot controls would change her answer. The VE said it would not change her response. However, if every limitation mentioned in Plaintiff's testimony were required, Plaintiff would not be able to perform any jobs.

## III. PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff argues that the ALJ erred in determining the onset date of her disability. She claims she was disabled in July 2008, not in June 2009, as the ALJ determined. This would entitle her to DIB benefits, as she was insured through December 2008.

A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.    Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically

8

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.  Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. *See Wright*

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

9

*v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.*; *see also Moon*, 923 F.2d at 1181. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through VE testimony. *See Wright*, 321 F.3d at *616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); *see also Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

C.      The ALJ Properly Determined the Onset Date for Plaintiff's Disability

The Magistrate Judge believes the ALJ had sufficient evidence for determining Plaintiff's disability onset date as June 4, 2009. Plaintiff first complained to Dr. Jain about back pain in November 2008. (Tr. 343-44). A lumbar CT on January 6, 2009 showed spinal stenosis at T12-L1 and osteoarthritis and facet hypertrophy at the multiple levels. (Tr. 346). In her February 2, 2009 Function Report, Plaintiff noted that the pain interferes with and limits activities, but she was able to clean house for about an hour, cook two meals, complete household chores, and shop for groceries twice per month. (Tr. 151-63). In February 2009, Dr. McLerran noted Plaintiff had pains shooting into the tops of both of her feet and a "great deal of problems with her back." (Tr. 286-95). Dr. Surber's consultative exam in April 2009 reflected Plaintiff's back pain, but straight-leg raises were negative. (Tr. 313). Significantly, Dr. Surber believed Plaintiff capable of light work, with the ability to stand or walk up to two to four hours and the ability to sit up to six to eight hours. (Tr. 311-15).

Plaintiff's condition clearly deteriorated in June 2009. On June 1, 2009, Plaintiff sought

10

treatment from Dr. McLerran, noting the pain flared up when she tried to get out of bed. (Tr. 387-90). The pain radiated down her left leg. *Id*. An MRI of the lumbar spine on June 4, 2009 revealed multilevel degenerative disc disease extending from T12 through S1. (Tr. 329-30). This apparently led to back surgery later in 2009. (Tr. 437-47).

Plaintiff cites SSR 83-20 for the proposition that the ALJ should have given more weight to her alleged onset date. However, SSR 83-20 provides that "the date alleged by the individual should be used if it is consistent with all the evidence available." Here, the ALJ determined that the medical evidence contradicted Plaintiff's alleged onset date of July 15, 2008. As noted above, the ALJ had substantial evidence for this determination. There was a deterioration of Plaintiff's back condition that led to her meeting Listing 1.04A, as she demonstrated evidence of nerve root compression.

The ALJ also properly discounted Plaintiff's credibility. An ALJ's finding on the credibility of a claimant is to be accorded great weight and deference, particularly since the ALJ is charged with the duty of observing the witness's demeanor and credibility. *Walters v. Commissioner of Social Security*, 127 F.3d 525 (6th Cir. 1997) (citing 42 U.S.C. § 423 and 20 C.F.R. 404.1529(a)). Like any other factual finding, an ALJ's adverse credibility finding must be supported by substantial evidence. *Doud v. Commissioner*, 314 F. Supp. 2d 671, 678-79 (E.D. Mich. 2003). The ALJ cited Dr. Surber's examination in April 2009, noting Dr. Surber found minimal reduction in Plaintiff's lumbar range of motion and no palpable tenderness or spasm in the area. (Tr. 311-15).

In short, the medical evidence fails to establish Plaintiff's claim that she became disabled prior to December 31, 2008. The ALJ had substantial evidence for determining that Plaintiff's condition worsened in 2009 and did not meet the listing until that time. While Plaintiff attempted to

offer some evidence of her condition in 2008 through Dr. Jain's sworn statement, Dr. Jain provided

no description of the progression of Plaintiff's back pain. (Tr. 437-47). It is the Plaintiff's burden to

prove her disability onset date, and the Magistrate Judge believes Plaintiff has failed to do so here.

*See* 42 U.S.C. § 423(d)(1)(A).

## IV. RECOMMENDATION

For the reasons set forth above, the Magistrate Judge **RECOMMENDS** that Plaintiff's

Motion be **DENIED** and this action be **DISMISSED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which

to file any written objection to it with the District Court. Any party opposing said objections shall

have fourteen (14) days from receipt of any objections filed in which to file any responses to said

objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and

Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*,

474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 15th day of November, 2012.

/S/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge

12